Court, please call the first case. 11-1220, Supreme Catering v. Catering Good afternoon, Members of the Court. Richard Zenz on behalf of Supreme Catering. The Court ordered the parties to address the issue of its subject matter jurisdiction in this case. And I understand and respect the Court's position in that regard. I've also read the cases cited in the Court's order. I also recognize that the issue of permanency in this workers' compensation matter remains undecided. However, given the seriousness of the case, as well as the fact that it was originally tried on all issues, including nature and extent, there were concerns about a possible waiver if an appeal had not been filed. Given that the employer-employee relationship is a threshold issue here, all other issues would fall if there were no employer-employee relationship. So we've taken the position that, with regard to the employer-employee relationship, that is a final order, although it certainly does not dispose of all the case. So are you saying we have jurisdiction? Yes. On what basis? It was remanded for determination of the need for VOC rehab, so it's further administrative proceedings, so how do we have jurisdiction? Well, again, I was operating on the presumption that the employer-employee relationship was a final issue because if the case goes back, if the appeal were dismissed and the case goes back, we would not relitigate the employer-employee issue because the Commission's already decided it. But isn't the issue the fact that it's being remanded for determination, the threshold question? The nature of the issue isn't controlling, is it? I'm sorry? The nature of the issue isn't controlling. It's the fact that it was remanded for further administrative proceedings. Do you see the dilemma? I understand the dilemma there. I'm just not prepared to concede at this point. Well, is it a final order? Pardon? Do you think it's a final order? All I'm saying is that the finality is with regard to the employer-employee relationship. But that's not a claim. Pardon? That's not a claim. Could you execute levy on the employer-employee relationship? No. No. So if it's not a final order, we have no jurisdiction over it. I mean, it's just that simple. I understand it. You know, so. Well, let me just ask. I have one question to the Court. Do you want me to address the merits of the case at this juncture, or I'm prepared to do so, but, you know, I am, we briefed the issue. Well, you're here, so I don't have an objection. I'm going to leave it up to the proceeding. Fine. Fine. You may proceed. Okay. Thank you. Rene Diaz leased a catering truck over a period of approximately 300 days. At trial, he testified that he was required to purchase his food products from Supreme and that he purchased coffee and donuts every single day. However, he produced, in support of that, three bills from three separate days showing what he purchased over this 300-day period. Not one of those bills had coffee or donuts on it. That fact standing alone, I do not believe, gives rise to a reasonable inference that he purchased all of his food stuff at the Supreme Catering Commissary. One percent of those bills, three out of 300, just does not support or support a finding that this is a clear preponderance of the evidence. We're all aware that the issue of control is paramount here with regard to an employer-employee relationship. However, Diaz never attended safety meetings. He was not paid a salary. He did not get a W-2 form. He did not get a 1099. He wore no uniform. He was not told where to buy his gasoline or to have a physical examination. He did not get benefits or vacation pay. And during the summer, he drove an ice cream truck when he wasn't driving the Supreme vehicle. The commission also relied on the fact that Mr. Diaz had no bargaining power with regard to the fact that he didn't speak English. Now, I really don't understand how that issue relates to the control over someone in an alleged employer-employee relationship. Moreover, the commission appears to ignore the fact that Diaz communicated in Spanish with Representative de la Supreme because he would testify that he could do this or he couldn't do that. Obviously, if he understood what he could and could not do, he had to understand it some way. If he didn't speak English, then the inference would be that he spoke Spanish and that he was instructed about some things in Spanish. So the commission's decision talking about him being unsophisticated and being at a disadvantage because he speaks Spanish, I really don't see how that deals well with the whole issue of control. I would suggest... I mean, it does turn on the issue of control, but isn't this a case where the employer apparently, I mean, gave him the assigned routes, told him when to report, what stops to make, what time to make the stops, how much to charge the products, charge for the products. I mean, wasn't there a greater amount of control that the employer exercised over what he did? Let me just address a couple of those issues, if I may. With regard to the purchasing of the food goods, if you look at Respondents 4 at trial, Respondents Exhibit 4, it addresses the issue of sales tax on the foodstuffs. But I think more significantly, it talks about how sales tax will be assessed. There's two categories. One deals with tax on items bought from Supreme Catering only. The other is tax on items bought from other sources. The commission never addressed that. That gives a clear inference that he had the option of buying them at other places besides Supreme. So when we talk about control, I think it goes to that very issue, along with the fact that all he could produce at trial were three different days of bills. So I think that is part of the problem here. The other issue that Your Honor brought up is the fact about when he was told to do this, that, and the other thing. He leased a route from them. That is true. However, Respondent's evidence, Supreme's evidence was that he reported to these particular sites at the time that would be most advantageous for him to be there. So in other words, if he wants to sell lunch, he's not going to show up at 3 o'clock to sell lunch. He'd have to show up sometime during the middle of the day and so on. So he had control over that. Their evidence was, and I realize this is a question of fact, that they did not instruct him when he had to be at a particular site. So I hope that answers your question. No, it doesn't. I think there's some facts in the record that suggest the claimant was an independent contractor. You have the lease agreement. You have the letter of reference. You also have the fact he had no customers of his own, as I understand it. He was actually prohibited from soliciting customers on the route until three years after termination of his lease. I guess to cut to the chase, the question is the manifest weight. As you know, there's some facts that suggest he was independent, granted. There's some facts that suggest that he was not supreme controlled, his manner and method while working. So why is an opposite conclusion to that drawn by the Commission clearly apparent here? Again, I don't think the manifest weight is supported by all of these facts. And I think that the key facts are the issue of where he had to purchase and the issue of, you know, he didn't have to wear a uniform, they didn't tell him how to dress and so on and so on. I recognize that there are issues of fact here. Okay? My argument is that this is basically a house of cards that starts to fall apart when one looks at the issue of control as it relates to where he had to purchase and the fact that Supreme said he could add his own customers and so on. I recognize that's a question of fact. And that's the position that we take. Thank you. Thank you. Counsel, please. Good afternoon. My name is Stuart Orshoff. I represent Rene Diaz in this case. This case boils down to control. Before we get to that threshold question, do you believe we have jurisdiction? If so, why? Again, I would join in with what Mr. Zanz has to say about the jurisdictional issue. And that basically is that, yes, I do believe it. I believe that the issue was whether or not we have the employer-employee relationship. That issue had to be decided before anything else could occur here. And there was a possibility that that issue had to go forward now. There is a possibility that there could have been a waiver of other elements here. And I believe that the Court should hear this at this point. Okay. Is there any case that says we have jurisdiction? Pardon me? No, I did not find a case that says we have jurisdiction. I'm aware of the case law. I read the case law. You might have gone with your argument. He had the opportunity, so you do as well. Oh, absolutely. And I appreciate that. The question in this case is control. And I believe the record is clear in many, many areas that there were many instances of control exercised by the employer or by Supreme Catering in this case. They took a fellow who drove an ice cream truck off the street. He had no prior experience in the catering business or operating a catering truck. He had no prior customers. They trained him how to do the job. They trained him on a route as to what companies to go to at what times. They had the ability to fire him in the event that he didn't follow the route, that he didn't, or if he was late. So they did have control in that regard. They supplied all the licenses. They paid for the licenses. They gave him a truck. It wasn't his truck. The truck had the name of Supreme Catering on it. He had to turn that truck in in the evening. This man clearly was not operating his own business. What about the fact that he signed an agreement saying he was an independent cash collector? He actually, as the testimony showed, he was told that either he had to sign this agreement or he can't go to work and he wanted the job. He was not, the testimony showed that he was not read the contents of that agreement because he didn't speak English, nor did he read English, and he was told that he had to sign it. The person who, the supervisor from the respondent who allegedly gave him the agreement and read it to him in Spanish later testified that he may have been on vacation on the day that he signed the agreement and he may not have had a chance to read it to him. So I don't believe the agreement means anything because of the fact that he didn't. There's no clear-cut evidence as to whether or not it was read to him and he understood it, but there is clear-cut evidence that he had to sign it in order to go to work. So as far as the other thing about the three bills that were introduced in order to, and the counsel argues that that's not sufficient because he worked for many other days. He should have introduced other bills. Those were the only three bills that he had. Was he allowed to work for somebody else while he was working for this company? He was allowed to drive his ice cream truck after work. That's all. Not during the day? Not during the day. Not during the day. They controlled his working day. The reason those three bills were introduced into evidence was to show the commission how the system worked, how he would get an invoice at the end of the day, and how he would turn it in and he would have to pay for the product that he purchased. And one of our main thrusts in this case is that he was required to buy the food from Supreme Catering, which is another element of control. The commission felt, his testimony, Mr. Diaz's testimony was that he was required to buy the food. The testimony of the general manager of Supreme was that he was not. Yet the testimony of the supervisor, Mr. Eberhall, was that it certainly was for our benefit that he would buy the food from us. And when the commission applied the common logic to the situation, they realized that if he didn't, that the respondent, it was a great benefit to the respondent that he bought the food because the respondent was making significant money from the purchase of this food. If he didn't buy the food, if he wasn't required to buy the food from the respondent, then he would be, the respondent would be collecting their expenses, basically. This licensing fee, and there was a daily fee of $10 and another fee of $24. There was about $50 in daily fees, which they would be collecting for him from expenses. Well, they're not putting 80 catering trucks on the street just to collect their expenses. They're putting 80 catering trucks on the street in order to make a profit, in order to make money. And the only way, and the main element of making money through these catering trucks was that they would be selling their food because it was testified to that the respondent bought the food from Pepsi-Cola or Coca-Cola at a low discounted price and sold it to the drivers at a very high markup. And these invoices show there was hundreds of dollars of food every day that were purchased. So that's where they were making their money. And to believe otherwise, that they weren't required to buy their food, would mean that they were running a business as a hobby as opposed to running a business for a profit. And the commission used their logic in order to make that inference based upon the evidence that was in front of them. Thank you, counsel. Thank you. The court will take the matter under advisory for disposition.